IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*v.*<br><br>CRAIG MURFEE ALLEN | Criminal Action No.<br><br>1:24-CR-00130-TWT |

### UNITED STATES MOTION FOR REVOCATION OF RELEASE ORDER AND STAY OF RELEASE ORDER

The United States of America, by Ryan K. Buchanan, United States Attorney, and Natasha Cooper and Christopher J. Huber, Assistant United States Attorneys for the Northern District of Georgia, files this Motion for Revocation of Release and Stay of Release Order pursuant to 18 U.S.C. § 3145(a)(1). The United States seeks detention because the defendant, Craig Murfee Allen, is a danger to the community, a serious risk of flight, and there is a serious risk that the Defendant will threaten or intimidate prospective witnesses. There are no release conditions that will reasonably assure the safety of any person and the community, and the Defendant's appearance in court proceedings, thus Defendant's bond order should be stayed and subsequently revoked.

### Factual Background

On April 23, 2024, the Defendant was arrested by FBI agents after being indicted by a federal grand jury in the Northern District of Georgia for wire fraud (Counts 1-15), money laundering (Counts 16-25) and securities fraud

(Count 26) in connection with an investment fraud scheme he orchestrated that resulted in at least $7 million in losses to victims across the country. (Doc 1). The government estimates his Guideline range will be 121-151 months.

On April 24, 2024, the Defendant had his initial appearance and the United States moved for detention based on the nature and circumstances of the offense, Defendant's dangerous substance abuse history that included a recent arrest for driving while under the influence, suicidal threats he made to victims, repeated history of failing to appear in a parallel Securities and Exchange Commission's investigation, and unstable living conditions. Per Defendant's request, the hearing was scheduled for April 25, and a temporary detention order was entered. (Docs. 10-12). The Defendant later requested additional time; thus, the hearing was assigned to a new Magistrate Judge, reset to May 1, 2024, and the Defendant remained temporarily detained.

*Nature and Circumstances of the Offense*

Defendant is charged with wire fraud, money laundering, and securities fraud for orchestrating an investment fraud scheme in connection with the Cheetah Fund, which resulted in at least $7 million in losses to victims across the country. The Defendant created and sent prospective investors, the Fund's tear sheets reporting false historic gains.[1] Once invested, the Defendant sent account statements showing false monthly investment returns, and false tax documents to support the reported fake gains. He also doctored emails from a reputable

---

[1] A tear sheet is a document that provides an investment overview and the investment's historical performance.

accounting firm to investors to send the false tax documents to further hide the scheme.

Victims relied on Defendant's misrepresentations, but unbeknownst to them, Defendant reported gains when the Fund had losses. Indeed, in at least one text message, the Defendant admitted "I reported gains when we had losses." (Gov. Ex. A at 2). In addition to creating fake documents to show false gains, the Defendant also directly stole investors' money by writing checks to himself from the Fund's account to pay for his personal expenses, including his lavish international trips. Defendant's actions led to determinantal losses to victims, including the loss of an elderly couple's life savings.

### *Defendant's Substance Abuse*

The Defendant has a dangerous substance abuse history, including Defendant's DUI arrest on February 28, 2024, after Atlanta Police Department officers saw him nearly cause an accident with a car traveling in the opposite direction. (Gov. Ex. B). "The vehicle in the opposite direction was forced to apply brakes aggressively to avoid the incident." *Id*. The Defendant was "sluggish", his motor skills were delayed, his speech was slurred, and he smelt like alcohol when officers pulled him over. *Id*. The Defendant continued to slur his speech when officers asked him to count, he could not stay balance during the "one leg stand" field sobriety test and refused any state administrated tests. *Id*. Officers arrested the Defendant for driving under the influence, reckless driving and having an expired registration and no insurance, as well as a traffic offense. *Id.*

The Defendant's driver's license was taken away and he was given a temporary driver's permit that required him to appear in court for his license reinstatement.

Less than two months later, before his DUI court date, when FBI agents were attempting to arrest him, they observed the Defendant going into three bars, drinking, and driving erratically and speeding through Buckhead the afternoon of April 23, 2024. When agents arrested the Defendant, he was standing in the parking lot of another restaurant/bar holding a straw with a bag of cocaine. (Gov. Ex. G). His speech was slurred, and he appeared under the influence.

The Defendant hired Ph.D. Adriana Flores to conduct a "suicide risk assessment" for his detention hearing. In Dr. Flores's report, Defendant admitted he entered a combination of inpatient rehabilitation programs and sober living programs three times since September 2022 – failing each time.

- In September 2022, he entered a rehabilitation facility and left after three days.
- In February 2023, he entered the same rehabilitation facility and "detoxed for five days."
- Shortly after, he entered a sober living program and relapsed after five weeks.

Defendant was arrested for his DUI in February 2023.

Defendant refused to provide any information about his substance abuse history to pretrial services.

*Suicidal Threats and Risk*

In January 2023, the Defendant emailed investors, to their surprise, that the Fund would be liquidated in cash and no trades were going to be made, because he was checking into a rehabilitation facility and would not have access to his phone. This email prompted many investors to panic. One investor who was close friends with the Defendant immediately reached out to him. Worried about the Defendant's wellbeing, the friend texted the Defendant and asked the Defendant to call him so that he could help. (Gov. Ex. A). The Defendant responded, "…we had continual losses from trading, and I reported gains…when we really had losses," *id*. at 1, and again admitted, "I reported gains when we had losses." *Id*. at 2. Even after this admission, the friend asked the Defendant which rehabilitation facility he was checked into and wanted to assist the Defendant with getting the proper help. *Id*. The Defendant later responded with multiple messages:

- "But I have a gun in my car if I want to check out!" *Id*. at 3 .

- "…Why would I be talking about checking out with a gun if there were money left." *Id*. at 7.

- "It's better for everyone if I was not here" *Id*. at 7.

- "This will be the last text message from this phone…if the (police/sec/fbi) are notified -THERE WILL BE NO RECOVERY OF ANYTHING…if they are notified I can only go to where I can't make money…there is nothing to

5

recover…they may find me…after a while…but I will not be breathing…"[2] *Id*. at 14.

Financial records later confirmed that the Defendant was not in a rehabilitation facility, rather, the Defendant traveled to Switzerland and the Netherlands.

On September 21, 2023, after the Defendant failed to appear in response to the SEC's first subpoena to testify (discussed below), the Defendant emailed an SEC attorney a photo of an unknown man in a hospital bed stating, "hearing about someone dying is one thing but watching them die is quite another." (Gov. Ex. F-4). Defendant provided no further explanation about the message or the photo (which was not a photo of him). Based on the Defendant's other suicide threats, this email appears to be another threat.

At the detention hearing, Defendant presented a "Suicide Risk Assessment" report prepared by psychologist Adriana Flores. In the report, Dr. Flores identified eight suicide risk factors the Defendant exhibits: depression, anxiety, alcohol abuse, financial problems, legal issues, impending divorce, separation from family. (Def. Ex. A at 2). Flores did not meet with the Defendant and based her entire analysis on a single two-hour videoconference conversation. Dr. Flores found that the Defendant had a low suicide risk, explaining away his multiple text messages by claiming, "he was not contemplating suicide" instead "he was so drunk when he sent the messages." *Id*.

---

[2] FBI agents later confirmed that the Defendant did in fact change his phone number.

Dr. Flores' report should be give little to no weight. She did not examine the Defendant. She admitted he exhibits at least eight suicide risk factors. In addition, Dr. Flores's credibility has been questioned by this Court. Magistrate Judge Walker gave Dr. Flores's report regarding competency "little, if any, weight." *Perkins v. United States*, 2020 WL 7685225, *12 (N.D. Ga. Apr. 13, 2020) (Report and Recommendation denying defendant's § 2255 motion).[3]

---

[3] Judge Walker further criticized Dr. Flores:

"Dr. Flores admitted that she is not board certified, and that out of over twenty cases from November 2015 to November 2019, she had testified only for the defense." (p. 17)

"Finally, although Dr. Flores opined that Movant was not competent at trial or sentencing, the undersigned finds that Dr. Flores's testimony is entitled to little, if any, weight." (p. 31)

"Given Movant's supposed quickness to attribute even a cough to a government conspiracy, it is remarkable that years passed by without any mention of any delusional ideation in Movant's medical records, as documented by Dr. Eberle and others."(p. 32).

"Dr. Flores, however, did not address any concerns that Movant's behavior could have been goal orientated," to change a condition of confinement. (p. 33).

The Report and Recommendation was adopted by Judge Totenberg (*Perkins v. United States*, 2020 WL 7041496 (N.D. Ga. Nov. 30, 2020). The findings were upheld by the Eleventh Circuit. *Perkins v. United States,* 73 F.4th 866, 875 (11th Cir. 2023) (noting that the magistrate "expressly discounting Dr. Flores's testimony as not credible and unreliable").

*Failure to Appear in Securities and Exchange Commission's Investigation*

Last month the Securities and Exchange Commission (SEC) filed a complaint against the Defendant, *Securities and Exchange Commission v. Craig Allen*, 1:24-cv-01771-SDG. During its investigation, the SEC twice served the Defendant with a subpoena to provide testimony. (Gov. Ex. C-D). The Defendant failed to appear both times. (Gov. Ex. F8 and F9). The Defendant communicated with the SEC regarding his testimony, but twice failed to appear with no notice and no explanation. He never complied with the subpoenas.

**Unstable Residence and Employment**

The Defendant no longer lives in his martial home and claims he has lived with a friend for the past eight to nine months. Now that he has been charged, that friend no longer is willing to have the Defendant live with him. The Defendant is estranged from many family members and friends and has no stable plan for where he would live if he was released on bond (if not in a treatment program). Additionally, Defendant does not have employment.

After the presentation of the evidence and argument on May 1, the Magistrate Judge continued the hearing until May 7, 2024, to allow the Defendant time to find a place to live. (Doc. 16). At the May 7 hearing, the Defendant presented that he now had a place to live, an in-patient residential "sober house" 10-month program. The United States opposed this proposal on several grounds, mainly because of the United States' continued concerns regarding flight risk and danger to the community. Defendant's history showed that he left and/or was unsuccessful with in-house residential treatment programs and a "sober house"

three times in 2022 and 2023. Additionally, these programs would not assure that the Defendant would not leave again, and subsequently have access to his car and substances.

Ultimately, the Magistrate Judge denied the United States' detention motion and temporarily detained Defendant until she orders his release.[4]

The United States now files this motion for revocation of the order of release under 18 U.S.C. § 3145(a)(i). Additionally, the United States requests that this Court enter an order staying the Magistrate Judge's release order and conduct its own *de novo* hearing on the issue of whether there exist any condition or combination of conditions that would ensure defendant's appearance and the safety of the community.

## Argument

### A. The 18 U.S.C. § 3142(g) Factors Support Detention

The United States moves for detention under 18 U.S.C. §§ 3142(e) and (f) on grounds that defendant is a danger to the community, a serious risk of flight, and a serious risk that that the Defendant will obstruct or attempt to obstruct justice. Section 3142 of Title 18 guides the courts' decision whether to release a defendant pending trial. *See* 18 U.S.C. § 3142. The defendant must be detained pending trial if "the judicial officer finds that no condition or combination of conditions will

---

[4] Defendant is being detained pending his surrender of his passport. Although he recently traveled to Europe, he claims that he does not know where his passport is. As of this filing, it does not appear that he has surrendered his passport to the Probation Office.

reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e)(1).  Under § 3142, the relevant factors informing that decision include "the nature and circumstances of the offense charged," "the weight of the evidence" against the defendant, "the history and characteristics" of the defendant, and "the nature and seriousness of the danger to any person or the community that would be posed" by the release of the defendant.  18 U.S.C. § 3142(g).  All of these factors weigh against releasing Defendant on bond.

### 1. The Nature and Circumstances of the Offense

The offense is extremely serious. Defendant manipulated friends and colleagues into investing in his investment fund, which turned out to be a fraud scheme. He created several types of fake documents that included tear sheets, account statements, and tax documents. Defendant sent out these fake account statements month after month to keep up his lies and misrepresentation of the Fund's performance. To conceal the scheme, he then pretended to be a reputable accounting firm and sent fake tax documents that led investors to file taxes reporting nonexistent gains.

In addition to these misrepresentations, Defendant also stole investors' money. Once investors wired money to the Fund's bank account, the Defendant wrote checks to himself from the Fund's account, and deposited the money into his personal account where he spent it.

Defendant is charged with fifteen counts of wire fraud, ten counts of money laundering, and one count of securities fraud. The Defendant's lies and scheme

caused at least $ 7 million in losses to victims across the country, including depleting people's life savings. The United States estimates his Guidelines will be 121-151 months (without acceptance of responsibility).

### 2. The Weight of the Evidence

The weight of the evidence is also strong. Defendant admitted he reported gains when the Fund had losses. (Gov. Ex. A). He claimed that he wanted to come clean and sign a confession of judgment. *Id*. He tried to intimidate an investor to not notify law enforcement and federal authorities by saying that if they were notified, there would be no recovery. *Id*. The Defendant emailed documents to investors that contained fake gains once compared with the Fund's actual financial records.

Financial records confirm Defendant's admission that he reported fraudulent gains when in fact the Fund suffered huge losses and was not earning anywhere near the 30% and higher gains he reported to investors. Additionally, Defendant's bank records show checks the Defendant wrote to himself from the Fund's business account, which he then used for himself and not for investing in the Fund.

### 3. Defendant's History and Characteristics

The Defendant's history shows he believes he is above the law and that he cannot be trusted. Within the last three months, Defendant was arrested for driving under the influence. (Gov. Ex. B). Despite this arrest, while driving on a temporary permit awaiting his Court date, on April 23, 2024, FBI agents observed Defendant visit three bars where he consumed alcoholic drinks and then drove

11

erratically through Buckhead around 4:00 pm on a busy Tuesday afternoon. When Defendant exited his car in the parking lot of yet another restaurant/bar, FBI agents went to go arrest him, and found him holding a bag of cocaine and a straw. (Gov. Ex. G). Defendant has tried Alcohol Anonymous sponsorship, inpatient rehabilitation facilities and sober living programs in 2022 and 2023, and he has left and been unsuccessful every time. Yet, this is the very thing the Magistrate Court ordered him to try again, despite three failed attempts and now facing greater stresses associated with a federal indictment, pending lawsuits, and an SEC complaint. Sending Defendant back to a rehabilitation facility, would only continue the same pattern of ineffective solutions that have not worked and have not stopped the Defendant from the destructive path he is on.

In addition to Defendant's prior alcohol and drug abuse, he has a history of failing to appear. Twice the SEC subpoenaed the Defendant, and both times he failed to appear. (Gov. Ex.C-F9). Defendant mocked the Commission's investigation and sent an email alluding to death, ignoring the seriousness of the situation and his conduct. (Gov. Ex. F4). Defendant showed a disregard of authority, consistent with his disregard of his February DUI arrest.

Defendant has no employment and no residence. It was ultimately his lack of residence, that led to the Magistrate Judge temporarily detaining him, however, having nowhere to stay is not the primary concern. The Defendant is a serious flight risk, which is what he warned in his text message, "if [sec/fbi] are notified I can only go to where I can't make money…there is nothing to recover…they may find me…after a while…but I will not be breathing…." Defendant's

residential instability coupled with his history of substance abuse history, his failure at treatment programs, and his failure to appear, show there are no set of set of conditions that would reasonably ensure his appearance once released or the safety of the community and himself.

### 4. The Nature and Seriousness of the Danger to Any Person or the Community

The nature and seriousness of danger to any person or the community likewise weigh in favor of detention. Danger to the community is broadly defined. A defendant may pose a danger to the community not only through "physical violence" but also if he or she "might engage in criminal activity to the detriment of the community." *United States v. King*, 849 F.2d 485, 487 n.2 (11th Cir. 1988) (quoting legislative history of the Bail Reform Act for proposition that "dangerousness" and "safety" are broad terms that contemplate criminal activity beyond "physical violence"); *United States v. Kidd*, No. 1:12–CR–379–02–WSD–RGV, 2013 WL 142317, at *3 (N.D. Ga. Jan. 11, 2013) (fact the defendant engaged in the conduct alleged in the pending prosecution while on bond for misdemeanor offenses "evidences the likelihood that Defendant will continue to engage in [criminal conduct] if he is released pending trial"). The Defendant's recent DUI arrest and him being found doing the same behavior he was just arrested for (drinking and doing drugs while driving), illustrate the exact danger Defendant is capable of. Thankfully, the first time there was a near miss accident, but that near miss and his arrest still did not serve as a wake-up call. Defendant

continued a destructive path. Releasing Defendant puts the community and his own life at risk. He has shown his inability to abide by the law.

In addition, there is a serious risk of obstruction of justice that weighs against the Defendant. Law enforcement would not have known of this crime but for the victims coming forward and reporting what the Defendant did. The Defendant held the Fund out as exclusive and personally invited each investor. Many of the investors were his friends, or friends of the Defendant's friends. Defendant's attempted manipulation of the victims gives rise to a serious risk of obstruction. Defendant has already threatened investors not to notify law enforcement or else he would kill himself, and that if he went to jail, the investors would recover no money. (Gov. Ex. A). These text messages are manipulative and intimidating. And the threats worked to some degree; it took months before investors came forward to report what occurred in hopes that the Defendant was going to recover money. Knowing that investors were seeking answers and some sort of recovery, Defendant strung them along into believing that if they kept their mouth shut, he could get them their money back. In Defendant's psychological report he admitted his own self-interest was his motivation.

> Moreover, he was focused on trying to convince Mr. Kittrell that he could not work on repayment if he was incarcerated. The statements were meant to motivate Mr. Kittrell to not go to the authorities. Mr. Allen's statements were meant as a push back. He used the statements "as leverage [to motivate Mr. Kittrell to not make police report), but not the truth."

Defendant Ex. A at 2.

Defendant has shown the lengths he is willing to go to coerce investors into not speaking with the authorities. For that reason, there is a serious risk of obstruction of justice and witness intimidation.

## Conclusion

The United States respectfully requests that the Court GRANT the United States' request for a stay of the Magistrate Judge's release order until such time as this Court can conduct a *de novo* hearing to determine whether any condition or combination of conditions of release can adequately assure Defendant's appearance on the charges in this district and the safety of the community.

Respectfully submitted,

RYAN K. BUCHANAN
   *United States Attorney*

/s/NATASHA COOPER
   *Assistant United States Attorney*
Georgia Bar No. 612489


/s/CHRISTOPHER J. HUBER
   *Assistant United States Attorney*
Georgia Bar No. 545627

600 U.S. Courthouse, 75 Ted Turner Drive S.W., Atlanta, GA 30303
(404) 581-6000   fax (404) 581-6181